**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

**FILED**

Nov 15 2012, 8:41 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MICHAEL B. TROEMEL**
Lafayette, Indiana

ATTORNEYS FOR APPELLEE:

**CRAIG JONES**
DCS, Tippecanoe County Office
Lafayette, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: | ) ) ) |
| B.T. (Minor Child), | ) ) |
| And | ) ) |
| B.J.T. (Father), | ) ) |
| Appellant-Respondent, | ) ) |
| vs. | ) No. 79A05-1107-JT-710 |
| | ) |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) |
| Appellee-Petitioner. | ) ) |

APPEAL FROM THE TIPPECANOE SUPERIOR COURT
The Honorable Loretta H. Rush, Judge
The Honorable Faith Graham, Magistrate
Cause No. 79D03-1104-JT-28

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**VAIDIK, Judge**

## Case Summary

Br.T. ("Father") appeals the involuntary termination of his parental rights to his child, B.T. Concluding that the Indiana Department of Child Services, local office in Tippecanoe County ("TCDCS"), presented clear and convincing evidence to support the trial court's judgment, we affirm.

## Facts and Procedural History

Father is the biological father of B.T., born in January 2010.[1] The facts most favorable to the trial court's judgment reveal that in late May 2010, the local Tippecanoe County Office of the Indiana Department of Child Services ("TCDCS") received a report alleging the family home was dirty and did not meet minimum standards. At the time, Father and Mother were living together, with B.T., in the maternal grandparents' home. TCDCS investigated the matter and discovered the conditions of the home to be "terribly cluttered and unsafe." Petitioner's Ex. 5. The family was provided an opportunity to improve the conditions of the home and did so, with the exception of Father's and Mother's bedroom which they shared with B.T. It still contained safety concerns including wires lying on the floor and "wobbly bookcases." Tr. p. 108.

---

[1] Father and B.T.'s biological mother, J.T. ("Mother"), are married and have been living together since 2008. Both Father's and Mother's parental rights were involuntarily terminated by the trial court in its June 2011 judgment. Mother appealed the termination order separately, and in February 2012, another panel of this Court affirmed the trial court's judgment as to Mother in a Memorandum Decision. *See In re B.T.*, 962 N.E.2d 163 (Ind. Ct. App. 2012), *trans. denied*. Consequently, we limit our recitation of the facts to those pertinent solely to Father's appeal.

TCDCS received a second report concerning the family the same week. This time, the report indicated there had been an incident of domestic violence between the parents and that local police personnel had been dispatched. When the police arrived, Father was not present in the home. Mother initially informed the police that Father had pushed her against the wall and choked her. As a result of this incident, Mother spent the night in a domestic-violence shelter.

The next day, Mother left the shelter and moved into the paternal grandparents' house to live with Father and B.T. Mother then contacted the police and recanted her original statement concerning the domestic dispute that had occurred just days earlier. Mother now reported that it was her own sister who had pushed Father, choked Mother, and then ran out of the room, hitting B.T.'s head on the wall. Mother explained that she had lied to the police about the incident because she was angry at Father. Mother also informed police that ever since B.T.'s head was hit, the child had been acting listless and had not been sleeping well.

Based on this new information, law enforcement officers had B.T. immediately transported to the hospital by ambulance to be evaluated. Emergency Room doctors found B.T. to be alert and responsive and without any observable marks or injuries. B.T. was therefore released to Father's and Mother's care. TCDCS was notified of Mother's change in story, and TCDCS initiated another assessment of the matter.

During its ensuing assessment, a TCDCS case manager visited Father and Mother at the paternal grandparents' apartment for the first time. Upon arrival, the case manager found the family home to be below minimally acceptable standards. In addition, the

apartment was cluttered with many of the same items that had been observed in the parents' previous residence with the maternal grandparents. When re-questioned about the domestic dispute that had occurred several days earlier, both parents vehemently denied that any domestic violence had ever occurred between them. Both parents also denied a documented incident of domestic violence that had occurred in 2008.

Based on the case manager's assessment of the most recent series of events, the substandard condition of the new family home, and growing concerns regarding Father's mental-health status, TCDCS took the child into emergency protective custody and filed a petition alleging B.T. was a child in need of services ("CHINS"). Following a hearing in July 2010, B.T. was so adjudicated. In August 2010, the trial court issued a dispositional order formally removing B.T. from both parents' care and custody and making the child a ward of TCDCS. The court's dispositional order further directed each parent to successfully complete a variety of tasks and services designed to address their respective parenting issues and to facilitate reunification with B.T. Among other things, Father was specifically ordered to participate in a parent/bonding assessment, psychological assessment, home-based case management services, supervised visitation with B.T., anger-management classes, medication-management services, individual counseling, random drug screens, and domestic-violence services including instruction on non-violent alternatives.

As per the trial court's dispositional orders, Father submitted to a psychological evaluation performed by Dr. Jeff Vanderwater-Piercy and Licensed Clinical Social Worker and Addictions Specialist Theresa Slayton. After assessing Father, Dr.

4

Vanderwater-Piercy and Slayton submitted a report in which they concluded that Father "presents with a psychotic disorder marked by delusional beliefs of a persecutory and somewhat grandiose nature." Petitioner's Ex. 6. The report further indicated that there "appears to be a history of recurrent depression and mania/hypomania. The clinical picture is further complicated by social anxiety, panic attacks, attention-deficits, and hyperactivity." *Id.* Additionally, the report stated that Father's "passive-aggressive" personality leads him to be "argumentative, contentious, resistant, and defiant," making Father a "very poor candidate for any significant behavior change." *Id.*

Father's participation in the remaining court-ordered services during the ensuing months was sporadic and ultimately unsuccessful. For example, Father refused to participate in anger-management counseling and attended only one session of the recommended Non-Violent Alternative program. In addition, Father's pervasive mental-health issues, delusional beliefs, and obsessive style of thinking continued throughout the case and required significant intervention and constant redirection during visits with B.T. and other services.

Although they initially denied any domestic violence in their relationship, both Father and Mother disclosed a history of domestic violence that spanned two years during a session in October 2010 with home-based specialist Stacia Schluttenhofer. Both parents also admitted that they had been in a physical altercation earlier that same day. In addition, Mother showed Schluttenhofer a picture of her face where Father had allegedly slapped her during another domestic dispute that had occurred approximately two weeks earlier. Schluttenhofer noticed that Mother's cheek appeared to be red in the picture.

As a result of this conversation, Schluttenhofer returned B.T. to the foster-care family and took Mother to a domestic violence shelter. Schluttenhofer later learned that Mother had left the shelter within two days in order to return to Father. Also, within one week, both Father and Mother had recanted their stories concerning their volatile relationship.

Regarding visitation, although Father attended many scheduled visits, he frequently played inappropriate music and/or watched videos on his laptop computer rather than interact with B.T. in an age-appropriate manner. Father also allowed B.T. to play with items during visits that were not toys and that posed a potential safety risk for B.T. Visitation supervisors observed that Father was unable to stay focused on interacting with B.T. during an entire visit. Instead, Father would become distracted with the gadgets and electronic equipment that he brought with him to every visit.

In April 2011, TCDCS filed a petition seeking the involuntary termination of Father's parental rights. An evidentiary hearing on the termination petition was held in May 2011. During the termination hearing, TCDCS presented significant evidence establishing that Father remained incapable of providing B.T. with a safe and stable home environment. TCDCS also introduced evidence showing Father failed to successfully complete anger-management and domestic-violence classes, never progressed past semi-supervised visits with B.T., and continued to struggle with significant mental-health issues.

At the conclusion of the termination hearing, the trial court took the matter under advisement. In June 2011, the trial court entered its judgment terminating Father's parental rights to B.T. Father now appeals.

**Discussion and Decision**

When reviewing termination of parental rights cases, we neither reweigh the evidence nor judge witness credibility. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

Here, in terminating Father's parental rights, the trial court entered specific findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *L.S.*, 717 N.E.2d at 208.

The "traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*,

666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. These parental interests, however, are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* In addition, although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001).

Before an involuntary termination of parental rights may occur in Indiana, the State is required to allege and prove, among other things:

(B)     that one (1) of the following is true:

(i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii)     There is a reasonable probability that the continuation of the  parent-child relationship poses a threat to the well-being of the child.

(iii)     The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C)     that termination is in the best interests of the child; and

(D)     that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).[2] "The State's burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257,

---

[2] We observe that Indiana Code section 31-35-2-4 was amended by Pub. L. No. 48-2012 (eff. July 1, 2012). The changes to the statute became effective after the filing of the termination petition involved herein and are not applicable to this case.

1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2). If the trial court finds that the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a). Father challenges the sufficiency of the evidence supporting the trial court's conclusions as to subsections (b)(2)(B) and (C) of the termination statute cited above. *See* I.C. § 31-35-2-4(b)(2).

### I. Conditions Remedied/Threat

We begin our review by observing that Indiana Code section 31-35-2-4(b)(2)(B) requires a trial court to find that only one of the three elements of subsection (b)(2)(B) has been established by clear and convincing evidence before properly terminating parental rights. *See L.S.*, 717 N.E.2d at 209. Here, the trial court determined that subsections (b)(2)(B)(i) and (ii) were established by clear and convincing evidence. Because we find it to be dispositive, we shall limit our review to whether TCDCS presented sufficient evidence to establish subsection (B)(i) of the termination statute, that is to say, whether TCDCS established by clear and convincing evidence that there is a reasonable probability the conditions resulting in B.T.'s removal and/or continued placement outside of Father's care will not be remedied. *See* I.C. § 31-35-2-4(b)(2)(B)(i).

A trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The trial court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id.* Pursuant to this rule, courts have properly

9

considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. Moreover, a county department of child services is not required to provide evidence ruling out all possibilities of change; rather, it need only establish that there is a reasonable probability the parent's behavior will not change. *In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). Finally, we have previously explained that Indiana's termination statute makes clear that "it is not just the basis for the initial removal of the child that may be considered for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside of the home." *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*.

Here, in determining that there is a reasonable probability the conditions leading to B.T.'s removal and/or continued placement outside Father's care will not be remedied, the trial court made several pertinent findings regarding Father's past and present inability to provide B.T. with a safe and stable home environment. Specifically, the trial court found that although the reunification services offered to Father were "exhaustive" and designed to address Father's "difficulties," at the time of the termination hearing, Father's circumstances "had not substantially improved." Appellant's App. p. 12-13. The trial court further noted that despite a "documented history of domestic violence between the parents" beginning in 2008 and both parents' disclosures regarding several incidents of domestic violence spanning "the past two years," both parents had since

10

"recanted these disclosures and now remain adamant that no domestic violence has ever occurred." *Id.* at 13. The court therefore determined that the "ongoing issue of domestic violence remains unaddressed and continues to be a safety risk for the child." *Id.*

As for Father's mental-health issues, the trial court specifically found that Father has a "long-standing history of serious mental illness and currently receives disability benefits." *Id.* The court further found that Father's mental illness "has manifested in violent behavior at times" and noted that Father was charged with Class D felony domestic battery in the presence of a child for an incident involving Mother that occurred in the presence of one of B.T.'s older siblings in July 2008. The court also observed that Father has been diagnosed with "Schizoaffective Disorder, Bipolar Type along with symptoms indicative of Panic Disorder with Agoraphobia as well as Pervasive Developmental Disorder (NOS), ADHD (Combined), and Generalized Anxiety disorder." *Id.* Finally, the trial court specifically found that Father's "pervasive mental health issues have continued" and "substantially impair his level of daily functioning" and that his mental illness "cause[s] Father to be so distracted that he is unable to properly supervise the child." *Id.* at 13-14.

Based on these and other findings, the trial court concluded that there is a reasonable probability the conditions resulting in B.T.'s removal and continued placement outside Father's care will not be remedied. In so doing, the trial court stated that "[n]either parent has yet to demonstrate the ability or willingness to make lasting changes from past behaviors. There is no reasonable probability that either parent will be able to maintain [the] stability or safety necessary to protect and provide adequately for

11

the child." *Id.* at 15. A thorough review of the record reveals that these findings and conclusions are supported by abundant evidence.

Testimony from TCDCS case managers and service providers makes clear that, at the time of the termination hearing, Father's circumstances and ability to care for B.T. remained largely unchanged. Since the time of B.T.'s removal, Father has failed to participate in and/or successfully complete a majority of the court-ordered services, including domestic-violence classes, individual therapy, and anger-management counseling.

During the termination hearing, home-based specialist Schluttenhofer informed the trial court that the "domestic violence issue" was the main issue she had been working on with Father during the underlying CHINS case but that Father "never really resolved anything" to that end. Tr. p. 55. Schluttenhofer further testified that Mother "was the main care provider [for B.T.] throughout all the visits" while Father "appeared to be preoccupied with his electronic devices [and] legal paperwork . . . ." *Id.* at 57. Schluttenhofer went on to testify that she had to "redirect" Father several times "throughout every single visit that we had." *Id.* at 58.

TCDCS case manager Kristin Meadows and home-based counselor Paige Heath likewise confirmed that Father was "not being compliant with his court orders" and that he seemed to have "his own agenda of things he wanted to discuss" during visits with B.T. and during home-based counseling sessions, rather than "on things that needed to be done in the case." *Id.* at 120, 175. Meadows also confirmed that Father never completed an anger-management program or individual counseling, continued to deny any domestic

12

violence had ever occurred in the family home, and would likely never be able to "change his parenting." *Id.* at 93.

The Psychological Evaluation and Parenting Assessment submitted by Dr. Vanderwater-Piercy and Slayton lends further support to the trial court's findings. In the report, Dr. Vanderwater-Piercy and Slaton concluded that Father's "ability to function adequately as a parent is significantly compromised by his clinical symptoms, particularly his psychosis." Petitioner's Ex. 6. They went on to explain that Father is "obsessed with his persecutory beliefs to the extent that he has difficulty focusing on anything else, including [B.T.], for an extended period of time." *Id.* Although the report acknowledged that Father "appears to have an emotional bond" with B.T., it further indicated that Father "seems to experience his parenting responsibilities as an annoyance or intrusion into his self-absorbed sense of persecution," and that multiple observers had noted Father's "lack of parenting knowledge and his reliance on [Mother] to assume most of the parenting responsibilities." *Id.* The report also noted that Father and Mother had a "very dysfunctional and unstable relationship marked by recurring conflict and domestic violence." *Id.* Finally, the report revealed that Father did not "recognize or accept the concerns that prompted [TCDCS] to take protective custody of [B.T.]," nor did he recognize the "need for services to address these concerns." *Id.*

Where a parent's "pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). Based on the foregoing, we conclude that TCDCS presented clear and convincing evidence to support the trial court's

13

findings cited above, including its conclusion that there is a reasonable probability the conditions resulting in B.T.'s removal and continued placement outside Father's care will not be remedied. These findings and conclusion, in turn, support the court's ultimate decision to terminate Father's parental rights to B.T. Fathers' arguments to the contrary, emphasizing an alleged lack of documented history of domestic violence and self-serving testimony regarding daily functioning and ability to supervise B.T., rather than the evidence relied upon by the trial court, amount to an impermissible invitation to reweigh the evidence. *See D.D.*, 804 N.E.2d at 264.

## II. Best Interests

We next consider Father's assertion that TCDCS failed to prove termination of his parental rights is in B.T.'s best interests. In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the Indiana Department of Child Services and look to the totality of the evidence. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the trial court must subordinate the interests of the parent to those of the child. *Id.* A trial court need not wait until a child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.* at 199.

In addition to the specific findings previously cited, the trial court made several additional pertinent findings in determining that termination of Father's parental rights is in B.T.'s best interests. Specifically, the court found that Father is able to provide only "limited information about [B.T.'s] developmental milestones or expectations and

14

frequently attempts interaction at an inappropriate developmental level." Appellant's App. p. 14. The court went on to find that Father "continuously attends visits with numerous electronic devices and peripheral accessories [that] he is unable to set aside while he focuses on the child's needs." *Id.* The court further elaborated, stating Father's "distractions during supervised visits result in safety concerns requiring constant redirection" and that this "struggle with developmentally inappropriate interactions and distractions remains pervasive throughout visits." *Id.*

As for Father's mental-health issues, the trial court acknowledged in its findings that Father's "current mental health providers support termination of Father's parental rights" and further noted that Father's "pervasive developmental disorder makes him 'unable to appropriately provide for the needs of the child.'" *Id.* (citing Petitioner's Ex. 4). Although the trial court acknowledged that Father loves B.T., it nevertheless determined that Father did not have the "current ability" to meet B.T.'s needs, finding it was "not safe for [B.T.] to be in the care of Father at this time." *Id.* at 15. Finally, the trial court specifically found that "[a]ll imaginable services" had been offered to Father but that "nothing is singularly different in today's circumstances since the time of removal." *Id.* at 15. The trial court therefore concluded that continuing the parent-child relationship "would be detrimental to the child." *Id.* These findings and conclusion, too, are supported by the evidence.

During the termination hearing, visit supervisor Michelle Stachowicz testified that she did not believe Father would be able to provide "extended routine care to a small child and be safe" outside of the controlled environment of supervised visitation. Tr. p.

135.   Stachowicz went on to testify that Father would "fixate and be engrossed" in random distractions during visits and was unable to refocus on B.T. without redirection from visit supervisors.  *Id.* at 136.  In recommending termination of Father's parental rights, case manager Meadows likewise testified that she believed "the continued relationship [between B.T. and Father] will be a danger to [B.T.'s] well[-]being."  *Id.* at 174.  Meadows further confirmed that B.T. was doing well and living in a pre-adoptive foster home.  Similarly, home-based services case manager Omar Sosa recommended termination of Father's parental rights.  In so doing, Sosa informed the trial court that until Father successfully addressed his mental-health and domestic-violence issues, Sosa believed that Father would be "unfit to parent" B.T.  *Id.* at 159.

Based on the totality of the evidence, including Father's unresolved parenting, domestic-violence, and mental-health issues, coupled with the testimony from Stachowicz, Meadows, Sosa, and other service providers recommending termination of Father's parental rights, we conclude that clear and convincing evidence supports the trial court's determination that termination of Father's parental rights is in B.T.'s best interests.

This Court will reverse a termination of parental rights "only upon a showing of 'clear error'– that which leaves us with a definite and firm conviction that a mistake has been made."  *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992)).  We find no such error here.

16

Affirmed.

MATHIAS, J., and BARNES, J., concur.